**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**LOUIS ELAIS LANGLINAIS, III**                            **CIVIL ACTION**

**VERSUS**                                               **NO. 13-3003-DEK**

**NELSON COLEMAN**
**CORRECTIONAL CENTER, ET AL.**

### ORDER AND REASONS

Plaintiff, Louis Elais Langlinas, III, a state prisoner, filed this civil action pursuant to 42 U.S.C. § 1983 asserting various claims against a number of officials at the Nelson Coleman Correctional Center in Killona, Louisiana.  Specifically, he alleges that Deputies Jones, Walker, and Powers falsified a medical report in order to have him placed on suicide watch on December 31, 2012.  When he protested, Lieutenant Gelston and Sergeant Beard would not listen to his side of the story, and, as a result, he was kept on suicide watch without clothing for several days.  Plaintiff further alleges that, while on suicide watch, he was later assaulted by Sergeant Dufresne and "Tasered" by Deputies Gilboy and Matherne.[1]  Lastly, plaintiff alleges that on a separate occasion he was sentenced to one hundred days in lockdown by Corporal Richardson without being afforded due process.

---

[1]      Plaintiff alleges that this second incident occurred on January 4, 2013; however, the facility records indicate that it occurred on January 1, 2013.

The defendants have filed a motion for summary judgment.[2]  Plaintiff has opposed that motion.[3]  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge.[4]

In reviewing a motion for summary judgment, the Court may grant the motion when no genuine issue of material fact exists and the mover is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  There is no "genuine issue" when the record taken as a whole could not lead a rational trier of fact to find for the nonmovant.  Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

"Procedurally, the party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact."  Taita Chemical Co., Ltd. v. Westlake Styrene Corp., 246 F.3d 377, 385 (5th Cir. 2001) (quotation marks and brackets omitted).  The party opposing summary judgment must then "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (quoting Fed.R.Civ.P. 56); see also Provident Life and Accident Ins. Co. v. Goel, 274 F.3d 984, 991 (5th Cir. 2001).  The Court has no duty to search the record for evidence to support a party's opposition to summary judgment; rather, "[t]he party opposing summary judgment

---

[2]     Rec. Doc. 118.

[3]     Rec. Doc. 125.

[4]     Rec. Doc. 73.

is required to identify specific evidence in the record and to articulate the precise manner in which the evidence supports his or her claim." Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998). Conclusory statements, speculation, and unsubstantiated assertions are not competent summary judgment evidence and will not suffice to defeat a properly supported motion for summary judgment. Id.; Douglass v. United Servs. Auto Ass'n, 79 F.3d 1415, 1429 (5th Cir. 1996).

In their motion for summary judgment, defendants advance a variety of arguments. The Court will address each in turn.

## I. *Res Judicata*

The defendants first argue that plaintiff's claims are barred by *res judicata* because they were previously asserted and ultimately dismissed for failure to prosecute in Langlinais v. Nelson Coleman Correctional Center, Civ. Action No. 13-2526, 2014 WL 644128 (E.D. La. Feb. 19, 2014). The Court disagrees. Although plaintiff's rambling *pro se* complaint in that action did briefly reference the incidents on which his instant claims are based, those references cannot fairly be considered as an assertion of the current claims, especially in that the individuals involved in those incidents (that is, the defendants in the current lawsuit) were not even named as defendants in that prior action.[5] Rather, that prior action challenged only the adequacy of the medical care at the jail, and it is clear that the Court interpreted the complaint in that manner. Id. at *1 ("Plaintiff, an inmate of the Elayn Hunt Correctional Center ('EHCC') at the time that suit was filed, complained of the

---

[5]     In his opposition to the defendants' motion, plaintiff explains that the references were simply illustrative and intended to show the "deliberate indifference" of the staff as a whole. Rec. Doc. 125, p. 4.

3

adequacy of the medical care that he received when he was previously confined at NCCC."). However, plaintiff filed the current action as a separate lawsuit asserting different causes of actions against different defendants,[6] and that is how the Court has construed and handled his complaints. Accordingly, the prior case and the rulings therein in no way preclude plaintiff from asserting the instant claims in this lawsuit.[7]

## II.  Exhaustion of Administrative Remedies

Defendants next argue that plaintiff's claims must be dismissed because he failed to exhaust his administrative remedies prior to filing this lawsuit.  The Prison Litigation Reform Act of 1995 ("PLRA"), as amended, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

Federal courts take a strict approach to the exhaustion requirement.  For example, the United States Supreme Court held that the exhaustion requirement is "mandatory," Porter v. Nussle, 534 U.S. 516, 524 (2002), and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong,"

---

[6]   See, e.g., Rec. Doc. 6, p. 2 (a letter to the Clerk of Court from plaintiff stating that he had filed two complaints, the first of which concerned his medical care and the second of which concerned the use of excessive force); see also Rec. Doc. 1, p. 15 ("It also is known that I do have a suit in federal court at this time, on medical.").

[7]   After plaintiff's medical claims were dismissed in Civil Action No. 13-2526, he filed a motion to amend the complaint in this lawsuit to reassert those dismissed claims.  Rec. Doc. 59. However, that motion was denied, Rec. Doc. 60; therefore, plaintiff's medical claims are not a part of this action and will not be addressed herein.

id. at 532.  The Supreme Court further held that "an inmate must exhaust irrespective of the forms

of relief sought and offered through administrative avenues."  Booth v. Churner, 532 U.S. 731, 741

n.6 (2001).  The United States Fifth Circuit Court of Appeals therefore concluded that "[q]uibbles

about the nature of a prisoner's complaint, the type of remedy sought, and the sufficiency or breadth

of prison grievance procedures were laid to rest in Booth."  Wright v. Hollingsworth, 260 F.3d 357,

358 (5th Cir. 2001).  Moreover, the Fifth Circuit emphatically held that the exhaustion requirement

cannot be excused by a federal court, stating:

> [T]here can be no doubt that pre-filing exhaustion of prison grievance processes is
> mandatory.  We thus hold that Underwood [v. Wilson, 151 F.3d 292 (5th Cir. 1998),]
> has been tacitly overruled and is no longer good law to the extent it permits prisoner
> lawsuits challenging prison conditions to proceed in the absence of pre-filing
> administrative exhaustion.  *District courts have no discretion to excuse a prisoner's
> failure to properly exhaust the prison grievance process before filing their
> complaint.*  It is irrelevant whether exhaustion is achieved during the federal
> proceeding.  *Pre-filing exhaustion is mandatory, and the case must be dismissed if
> available administrative remedies were not exhausted.*

Gonzalez v. Seal, 702 F.3d 785, 788 (5th Cir. 2012) (emphasis added; footnote omitted).

Here, there is no question that plaintiff was a prisoner at the time he filed this lawsuit and

that the PLRA's exhaustion requirement applies.  However, the parties dispute the degree to which

administrative grievance procedures were truly "available" at the Nelson Coleman Correctional

Center and the degree to which plaintiff availed himself of those procedures.

For their part, the defendants, who bear the burden of proof with respect to the affirmative

defense provided by 42 U.S.C. § 1997e(a),[8] have not provided the Court with certified copies of

---

[8]    Abbott v. Babin, Civ. Action No. 14-30141, 2014 WL 4802742, at *2 (5th Cir. Sept. 29,
2014) ("When defendants seek to avail themselves of the affirmative defense of failure to exhaust,
they bear the burden of showing that administrative remedies were not exhausted."); Morgan v.

plaintiff's grievance records or any affidavits concerning the purported lack of exhaustion in connection with their motion; instead, they elect simply to rely on plaintiff's statements in his original complaint.  However, plaintiff's statements have been inconsistent.  For example, he first indicated that he submitted a grievance concerning his placement on suicide watch but not one regarding the use of excessive force;[9] he later seemed to suggest that he did file a grievance concerning his excessive force claim;[10] he then stated that he made repeated efforts to file grievances;[11] he later stated that jail officials warned him not to file a grievance on his excessive force claim while at the jail, but that he filed such a grievance after being transferred from that facility;[12] and, most recently, he stated that officers destroyed or refused to accept his grievances.[13] Obviously, therefore, genuine issues of material fact remain in dispute regarding exhaustion. Accordingly, the defendants have not established that they are entitled to judgment as a matter of law with respect to that affirmative defense.

---

Texas Department of Criminal Justice McConnell Unit, 537 Fed. App'x 502, 508 (5th Cir. 2013); Dillon v. Rogers, 596 F.3d 260, 266 (5th Cir. 2010) ("Since exhaustion is an affirmative defense, the burden is on [the defendants] to demonstrate that [the prisoner] failed to exhaust available administrative remedies.  Consequently, [the defendants] must establish beyond peradventure all of the essential elements of the defense of exhaustion to warrant summary judgment in their favor." (citation omitted)).

[9] Rec. Doc. 1, p. 3.

[10] Rec. Doc. 1, p. 27.

[11] Rec. Doc. 26, p. 17.

[12] Rec. Doc. 34, p. 16.

[13] Rec. Doc. 125, pp. 5-6.

### III.  Qualified Immunity

The defendants next argue that they are entitled to qualified immunity with respect to the claims that they improperly placed plaintiff on suicide watch and used excessive force against him. Where, as here, qualified immunity has been asserted, the burden shifts to the plaintiff to rebut that defense.  Harris v. Serpas, 745 F.3d 767, 771 (5th Cir. 2014).

Regarding the evaluation of the qualified immunity defense in connection with a motion for summary judgment, the United States Supreme Court recently explained:

> In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry.  The first asks whether the facts, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right. ...
>
> The second prong of the qualified-immunity analysis asks whether the right in question was "clearly established" at the time of the violation.  Governmental actors are shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  The salient question is whether the state of the law at the time of an incident provided "fair warning" to the defendants that their alleged conduct was unconstitutional.
>
> Courts have discretion to decide the order in which to engage these two prongs.  But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.  This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. Proc. 56(a). In making that determination, a court must view the evidence in the light most favorable to the opposing party.

Tolan v. Cotton, 134 S. Ct. 1861, 1865-66 (2014) (citations, quotation marks, ellipses, and brackets omitted).

A.  Placement on Suicide Watch

Plaintiff's first claim is that Deputies Jones, Walker, and Powers had a "personal vendetta" against him and so conspired to falsely report that he was suicidal in order to have him placed on suicide watch.  The defendants counter that they had been advised by other inmates that plaintiff was suicidal, and, therefore, his placement on suicide watch was a reasonable and necessary precaution.

In support of the motion for summary judgment, defendant Jones has submitted an affidavit in which he states in pertinent part:

1. I authored the Incident Report attached as Exhibit 5 to Defendants' Motion for Summary Judgment, Bates # SCSO 415-419.
2. Everything contained in the Incident Report is accurate and true to the best of my knowledge, information and belief.
3. Two fellow inmates of Plaintiff advised me that Plaintiff was threatening to hang himself.
4. I then escorted Plaintiff to the Medical Department where he was evaluated by Licensed Practical Nurse Smith.
5. LPN Smith contacted physician, Dr. Durante, who advised to place plaintiff on suicide watch.[14]

In the referenced Incident Report, Jones stated:

ON MONDAY DECEMBER 31, 2012 AT 0130 HRS. REPORTING OFFICER WAS NOTIFIED BY DEP. GIL THAT INMATE LANGLINAIS, LOUIS ON D3-602 WAS CAUSING A LOUD DISTURBANCE IN D3 AND DEP. GIL ORDERED INMATE LANGLINAIS TO STOP SEVERAL TIMES TO NO AVAIL.

UPON ENTERING THE POD (D3) REPORTING OFFICER ALONG WITH DEPUTY POWERS AND DEPUTY WALKER IMMEDIATELY OBSERVED INMATE LANGLINAIS STANDING AT THE BARS OF HIS CELL YELLING AND CURSING IN A LOUD AND BOISTEROUS VOICE. DEPUTIES ADVISED HIM SEVERAL TIMES TO CALM DOWN AND HAVE A SEAT. INMATE LANGLINAIS CONTINUED TO YELL AND SCREAM TOWARDS DEPUTIES REFUSING TO CALM DOWN AND SIT ON HIS BUNK.  AFTER SEVERAL MINUTES DEPUTY POWERS ORDERED THE INMATE TO HIS

---

[14]   Rec. Doc. 118-8, pp. 1-2.

BUNK TO CHANGE OUT HIS SHORTS FOR LOCKDOWN.  INMATE LANGLINAIS COMPLIED AND DEPUTIES EXITED THE CELL.

WHILE REPORTING OFFICER WAS EXITED [sic] THE POD INMATE CLEMENT, ROLAND (D3-607B) ASKED TO SPEAK TO DEPUTIES. REPORTING OFFICER SPOKE TO INMATE CLEMENT AND INMATE WITHAM (D3-607) WHO BOTH STATED TO DEPUTIES THAT INMATE LANGLINAIS WAS YELLING THAT HE WANTED TO HURT HIMSELF AND "HE SHOULD TRY HANGING HIMSELF".  REPORTING OFFICER THEN SPOKE TO INMATE LANGLINAIS ABOUT THE INCIDENT AND HE REPLIED "NO, HE DIDN'T SAY THAT SHIT" BUT THEN BEGAN TO SCREAM AND YELL ABOUT BEING ON LOCKDOWN.  REPORTING OFFICER EXITED THE POD AND ENTERED THE CONTROL TOWER ON DELTA AND SPOKE WITH DEPUTY GIL WHO ALSO STATED THAT BEFORE DEPUTIES ARRIVED ON SCENE INMATE CLEMENT BUZZED THE POD AND ADVISED HIM THAT HE HAD HEARD INMATE LANGLINAIS STATE THAT HE WANTED TO HANG HIMSELF. DEP. GIL STATED HE HAD TO WAIT UNTIL OTHER DEPUTIES ARRIVED TO SPEAK TO INMATE LANGLINAIS ABOUT THE MATTER.  REPORTING OFFICER ADVISED LT. GELSTON AND SGT. BEARD OF THE INCIDENT AND WAS ADVISED TO ESCORT INMATE LANGLINAIS TO MEDICAL FOR EVALUATION.  IT SHOULD BE NOTED THAT THE ENTIRE TIME WHILE BEING ESCORTED TO MEDICAL INMATE LANGLINAIS CONTINUED TO YELL AND BE AGGRESSIVE.

REPORTING OFFICER ESCORTED INMATE LANGLINAIS TO MEDICAL WHERE HE WAS EVALUATED BY LPN. SMITH.  REPORTING OFFICER ADVISED LPN. SMITH OF THE INCIDENT AND THAT REPORTING PERSON WAS ADVISED BY OTHER INMATES THAT INMATE LANGLINAIS STATED SEVERAL TIMES THAT HE WANTED TO HURT HIMSELF.  LPN SMITH SPOKE TO DR. DURANTE WHO ADVISED TO PLACE INMATE LANGLINAIS ON SUICIDE WATCH UNTIL HE CAN BE SEEN AS SOON AS POSSIBLE.  WHILE ESCORTING INMATE LANGLINAIS OUT OF MEDICAL EN ROUTE TO A08 HE BECAME VIOLENT AND STARTED TO PUSH BACK IN THE WHEELCHAIR YELLING AT THE TOP OF HIS VOICE.  SGT. BEARD AND LT. GELSTON MET OFFICERS IN THE HALLWAY HELPING ESCORT INMATE LANGLINAIS TO A08.[15]

---

[15]   Rec. Doc. 118-8, p. 6.  The Court notes that, throughout this proceeding, plaintiff has speculated, without foundation, that Dr. Durante was not actually called.  To resolve that issue, the Court, at plaintiff's request, required the defendants to produce the relevant telephone records. Records were ultimately produced which showed that Dr. Durante was in fact called.  Rec. Doc. 130.

Defendant Beard also submitted an affidavit in which he states in pertinent part:

3.   I investigated Plaintiff's Complaint that Deputies William Powers, Walker, and Steven Jones falsified a medical report accusing him of being suicidal to use cell A08 as a form of punishment.

4.   I interviewed Inmate Clements who admitted to telling the deputies that Plaintiff said he was going to kill himself.

5.   I then sent a contemporaneous email to Lt. Maureen Gelston regarding my findings, which is attached as Exhibit 11 to Defendants' Motion for Summary Judgment, Bates # SCSO 707-708.

6.   The summary of my findings in Exhibit 11 are all accurate and true to the best of my knowledge, information and belief.[16]

In the referenced email, Beard wrote:  "I asked Inmate Clement about if he ever said anything about Inmate Langlinais being suicidal that night.  Inmate Clement advised he did tell the officers but just was joking."  Gelston replied:  "Wow.  Just joking?  Really?  Well look what his 'joke' did.  I hope you told him that we take this kind of stuff seriously and suicide is not a joking matter."[17]

A problem for the defendants, however, is that plaintiff has also submitted an affidavit with respect to this issue.  That affidavit is from inmate Witham, one of the two inmates who the defendants contend reported that plaintiff was suicidal.  Although his affidavit is riddled with spelling and grammar errors (which the Court makes no effort to correct herein), Witham clearly contradicts the defendants' version of events, stating:

1)   I have been incarcerated at St. Charles Parish Jail since January 13 2012. Since December 30 2012 I have been housed in Block D 607.  I am currently in which is four cells down in Cell 603 is Louis E. Langlinais III and has been for several hours.

2)   On December 30, 2012 I saw Officer Jones, Power and Walker approach Cell 603, than walked down to 607 were I Pedro Witham was housed and asked

---

[16]   Rec. Doc. 118-14, pp. 1-2.

[17]   Rec. Doc. 118-14, p. 3.

> me and my cell mate Roland Clement if Louis Elais Langlinais III had said that he was suicide.  We both look at each other and said "No way" NOT "Wheel chair" he would never do anything like that, he has been through to much.
>
> 3)    So Officer Jones Power and Walker walked back in front of Cell 603 were Louis Langlinais was housed laughing with each other.
>
> 4)    Within 20 minute Louis Langlinais cell door open and Louis Langlinais was then having trouble comming down the stairs.  The housing unit door opened and Louis left the pod.  Before he left several inmates shouted to him about "IT being a set up!"[18]

Obviously, therefore, whether Witham and Clement actually reported that plaintiff was suicidal is disputed.  However, that disputed factual issue does not preclude summary judgment because it is ultimately immaterial.  *Even if* Witham and Clement did **not** report to the defendants that plaintiff was suicidal and *even if* the defendants knew that they were causing plaintiff to be placed on suicide watch without probable cause, they, as noted below, would still be entitled to qualified immunity.

When considering that defense, courts have discretion to decide which prong of the qualified immunity analysis to consider first.  Here, the Court elects to proceed directly to second prong of the analysis.  Under that second prong, plaintiff must be able to show that he had a "clearly established" right not to be placed on suicide watch without probable cause.  He cannot make that showing for the following reasons.

As a preliminary matter, however, the Court acknowledges that the conditions on suicide watch are restrictive and unpleasant.  The Court further acknowledges that a practice of subjecting inmates to such conditions without probable cause would be offensive and would have no place in

---

[18]    Rec. Doc. 125-2, pp. 84-85.

this nation's jails.  Nevertheless, the Court simply cannot say that an inmate has a clearly established

*constitutional right* not to be placed on suicide watch without probable cause.  On the contrary, a

number of cases have expressly found that there is no such constitutional right.  For example, in

Lewis v. Olds, Civ. Action No. 4:08-CV-495, 2009 WL 186226 (N.D. Tex. Jan. 26, 2009), United

States District Judge Terry R. Means held:

> Lewis complains that defendant Olds ordered him to be placed in a solitary suicide-watch cell without probable cause, which is treated as a claim that he was placed in administrative segregation without due process of law.  The Fourteenth Amendment to the Constitution provides that no State shall "deprive any person of life, liberty, or property without due process of law."  Thus, the Court must first determine whether a property or liberty interest exists that is entitled to due-process protection.  But, an inmate has neither a protected property nor liberty interest in his custody classification.  Furthermore, a prisoner's liberty interest is "generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  In Sandin v. Connor, [515 U.S. 472 (1995),] the Court held that a prisoner's "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest."  In light of Sandin, the Court of Appeals for the Fifth Circuit held that, "administrative segregation, without more, simply does not constitute a deprivation of a constitutionally cognizable liberty interest."  Controlled by these precedents, Lewis's placement in suicide-watch segregation as stated in the complaint does not rise to the level of an atypical and significant hardship.  Thus, Lewis's due-process claim based upon the suicide-watch cell placement has no arguable basis in law, and must be dismissed.

Id. at *1 (footnotes omitted).  Accord Stewart v. Warner, Civ. Action No. 13-4759, 2014 WL

3498165, at *5-6 (E.D. La. July 15, 2014); Jones v. Blackburn, No. 3:14-cv-01229, 2014 WL

2480601, at *6 (M.D. Tenn. June 2, 2014) ("There is no constitutional right to avoid being placed

on suicide watch."); Hunter v. Williams, No. 3:13-cv-00592, 2013 WL 3467097, at *2 (M.D. Tenn.

July 10, 2013) ("[B]ecause there is no liberty interest in assignment to any particular prison, or

housing unit within a prison, the plaintiff has no due process claim for being placed on suicide watch."); Jones v. Lee, Civ. Action No. 2:09-CV-11283, 2012 WL 683362, at *4 (E.D. Mich. Mar. 2, 2012) ("Temporary placement on suicide watch, even when not necessary, does not implicate a liberty interest protected by the Due Process Clause nor does it amount to cruel and unusual punishment under the Eighth Amendment."), adopted, 2012 WL 1048541 (E.D. Mich. Mar. 28, 2012); Morris v. Winn Correctional Center, No. 08-CV-1488, 2009 WL 2391844, at *2-3 (W.D. La. Aug. 4, 2009); Starks v. Couch, Civ. Action No. 08-cv-407, 2009 WL 331357, at *2 (S.D. Ill. Feb. 11, 2009) ("Starks has not stated a claim for a due process ... violation because there is no constitutional right to avoid being placed on suicide watch."); Rogers v. Paquet, No. 3:01-CV-0969, 2001 WL 1148256, at *3 (N.D. Tex. Sept. 18, 2001).  But see Earl v. Racine County Jail, 718 F.3d 689, 691 (7th Cir. 2013) (indicating that an inmate has a protected liberty interest against being placed on suicide watch without due process "if the more restrictive conditions are particularly harsh compared to ordinary prison life or if he remains subject to those conditions for a significantly long time").

Therefore, the issue of whether an inmate has a constitutional right not to be placed on suicide watch without probable cause is, at very least, debatable.  As a result, *even if* the defendants did precisely as plaintiff alleges, they are entitled to qualified immunity because, as the United States Fifth Circuit Court of Appeals explained:

> The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal. This immunity protects all but the plainly incompetent or those who knowingly violate the law, so we do not deny immunity unless existing precedent must have placed the statutory or constitutional question *beyond debate*.

Morgan v. Swanson, 659 F.3d 359, 370-71 (5th Cir. 2011) (footnotes and quotation marks omitted).

Further, that result is unchanged even if plaintiff's allegations are construed as a retaliation claim.  It is, of course, true that "[a]n action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate."  Woods v. Smith, 60 F.3d 1161, 1165 (5th Cir. 1995).  However, "[p]risoners' claims of retaliation are regarded with skepticism and are carefully scrutinized by the courts."  Zebrowski v. U.S. Federal Bureau of Prisons, 558 Fed. App'x 355, 358 (5th Cir.), cert. denied, 135 S. Ct. 60 (2014).  Accordingly, "[a] prisoner alleging retaliation must establish '(1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation.'"  Garner v. Moore, 536 Fed. App'x 446, 449 (5th Cir. 2013) (quoting Morris v. Powell, 449 F.3d 682, 684 (5th Cir. 2006)).

Here, although plaintiff alleges that the defendants had a "personal vendetta" against him, he does not allege that they were retaliating against him *based on his exercise of a constitutional right*.  Rather, he alleges that his placement on suicide watch was precipitated by the defendants' frustration or anger over their perception that he had escaped punishment for what they perceived to be disciplinary violations.[19]  Again, if that occurred, the Court takes a dim view of the defendants' actions.  Nevertheless, because their actions were not taken to retaliate against plaintiff for exercising a specific constitutional right, he simply has not stated a cognizable "retaliation" claim.

Plaintiff's related claim against defendants Gelston and Beard must also be dismissed.  As noted, plaintiff has sued those defendants because they refused to intervene when he complained that

---

[19]   Rec. Doc. 34, pp. 5-8.

he was being "set up" by Jones, Walker, and Powers.  That claim fails for two reasons.  First, just as Jones, Walker, and Powers are entitled to qualified immunity for having plaintiff placed on suicide watch, Gelston and Beard would similarly be protected by qualified immunity for their failure to intervene to prevent that placement.  Further, in any event, the claim against Gelston and Beard is essentially a claim that they failed to act on plaintiff's complaint.  However, an inmate has no constitutional right to have his complaints investigated and resolved to his satisfaction.  Propes v. Mays, 169 Fed. App'x 183, 184-85 (5th Cir. 2006); Geiger v. Jowers, 404 F.3d 371, 373-74 (5th Cir. 2005); Tyson v. Tanner, Civ. Action No. 08-4599, 2009 WL 2883056, at *5 (E.D. La. Aug. 25, 2009); George v. Travis, Civ. Action No. 07-986, 2007 WL 1428744, at *7 (E.D. La. May 10, 2007).

<u>B.  Excessive Force</u>

Plaintiff's next claim is that Sergeant Dufresne and Deputies Gilboy and Matherne used excessive force.  The defendants do not dispute that force was used; however, they argue that the force was reasonable and necessary to restore order when plaintiff began acting out aggressively.

In support of the motion for summary judgment, defendant Gilboy has provided an affidavit stating:

1.   I authored the Incident Report attached as Exhibit 9 to Defendants' Motion for Summary Judgment, Bates # SCSO  380-383.
2.   Everything contained in the Incident Report is accurate and true to the best of my knowledge, information and belief.
3.   Plaintiff attacked Sgt. Steven Dufresne on January 1, 2013.
4.   Plaintiff aggressively approached Sgt. Dufresne, screaming inches from Sgt. Dufresne's face.
5.   Plaintiff had to be pinned up against a wall at which time Plaintiff wrapped his arm around Sgt. Dufresne's neck.
6.   Plaintiff then had to be tasered to gain control of him so he could be handcuffed and placed in a restraint chair for his safety.

15

7.      Plaintiff was not handcuffed when tasered.[20]

In the referenced Incident Report, Gilboy stated:

> ON THE ABOVE DATE, AT APPROXIMATELY 1807HRS, I/M LOUIS LANGLINAIS BEGAN KICKING THE DOOR IN CELL A-08 DEMANDING TO SPEAK TO RANK.   CORPORAL KERNICER HOLMES ORDERED I/M LANGLINAIS TO STOP HITTING THE DOOR AND TO SIT DOWN IN THE REAR OF THE CELL.  I/M LANGLINAIS REFUSED TO COMPLY AND TOLD CORPORAL HOLMES THAT SHE WAS NOT A RANKING OFFICER.  I/M LANGLINAIS CONTINUED TO HIT THE DOOR AND YELL THAT HE DIDN'T WANT TO SPEAK TO ANY "BITCH-ASS DEPUTIES."  SERGEANT STEVEN DUFRESNE  THEN  ENTERED  CELL  A-08  AND  SPOKE  WITH  I/M LANGLINAIS.  I/M LANGLINAIS BEGAN YELLING THAT HE WANTED TO SPEAK TO THE LIEUTENANT AND THAT HE WANTED A MATTRESS AND A BLANKET. SERGEANT DUFRESNE ADVISED I/M LANGLINAIS THAT HE WAS NOT GETTING A MATTRESS OR A BLANKET WHILE HE WAS ON SUICIDE  WATCH.     SERGEANT  DUFRESNE  THEN  ORDERED  I/M LANGLINAIS TO STOP HITTING THE DOOR AND TO BE QUIET. SERGEANT DUFRESNE THEN EXITED THE CELL.  WHILE ATTEMPTING TO CLOSE THE DOOR OF THE CELL, I/M LANGLINAIS ATTEMPTED TO PUSH THE DOOR OPEN.  SERGEANT DUFRESNE ALONG WITH DEPUTY DYLAN COCHRANE THEN FORCED THE DOOR CLOSED.  AT THAT TIME, I/M LANGLINAIS STARTED HITTING THE DOOR AGAIN AND YELLING.
> SERGEANT DUFRESNE THEN ENTERED CELL A-08 AGAIN ALONG WITH DEPUTY JOSHUA GILBOY, DEPUTY SCOTT CATALANOTTO, AND DEPUTY DYLAN COCHRANE AND ORDERED I/M LANGLINAIS TO STOP YELLING AND HITTING THE DOOR.  I/M LANGLINAIS THEN APPROACH SERGEANT  DUFRESNE  AND  RAISED  HIS  RIGHT  HAND  IN  AN AGGRESSIVE MANNER.  LET IT BE KNOWN THAT I/M LANGLINAIS HAS BEEN REBOOK ON BOTH 12/31/2012 AND EARLIER ON THE ABOVE DATE UNDER RS 14:34.2B3 (BATTERY OF A POLICE OFFICER W/ INJURY). SERGEANT DUFRESNE THEN ATTEMPTED PLACE I/M LANGLINAIS ON THE GROUND IN THE PRONE POSITION.   I/M LANGLINAIS WRAPPED BOTH OF HIS ARMS AROUND SERGEANT DUFRESNE'S NECK AND WOULD NOT LET GO.  DEPUTY GILBOY THEN DEPLOYED HIS TASER X-26 (X00-392102) WITH CARTRIDGE #C4101MHC7 AND ADMINISTERED A FIVE-SECOND  CYCLE  WITH  A  FOLLOW-UP  STUN  DRIVE  TO  I/M LANGLINAIS. DEPUTY CATALANOTTO AND DEPUTY COCHRANE THEN

---

[20]   Rec. Doc. 118-12, pp. 1-2.

ATTEMPTED TO GAIN CONTROL OF BOTH OF I/M LANGLINAIS' ARMS, BUT I/M LANGLINAIS WOULD NOT PLACE HIS LEFT HAND BEHIND HIS BACK.   DEPUTY GILBOY GAVE I/M LANGLINAIS SEVERAL LOUD VERBAL COMMANDS TO PLACE HIS HAND BEHIND HIS BACK TO WHICH HE WOULD NOT COMPLY.

DEPUTY GILBOY THEN ADMINISTERED A SECOND FIVE-SECOND CYCLE WITH A FOLLOW-UP STUN DRIVE TO I/M LANGLINAIS.   I/M LANGLINAIS THEN PLACED BOTH HANDS BEHIND HIS BACK.   I/M LANGLINAIS WAS THEN HANDCUFFED (CHECKED FOR PROPER FIT AND DOUBLE-LOCKED).   SERGEANT DUFRESNE THEN ORDERED DEPUTIES TO PLACE I/M LANGLINAIS IN THE RESTRAINT CHAIR.   I/M LANGLINAIS WAS THEN UNHANDCUFFED AND PLACED IN THE RESTRAINT CHAIR UTILIZING THE SOFT RESTRAINTS.   AT 1817HRS, LPN MELISSA GROS ARRIVED AT THE SCENE AND CHECKED I/M LANGLINAIS'S VITAL SIGNS AND CAPILLARIES WITH NO INJURIES NOTED.   CRIME SCENE TECH THOMAS PLAISANCE ARRIVED AT 1930HRS. AND COLLECTED TASER CARTRIDGE, PROBES AND SAMPLE AFIDS.   CRIME TECH PLAISANCE THEN TOOK DIGITAL PHOTOGRAPHS OF WHERE THE PROBES AND THE DRIVE STUNS MADE CONTACT.   I/M LANGLINAIS WAS THEN BOOKED ACCORDINGLY UNDER RS 14:108 (RESISTING AN OFFICER).[21]

Moreover, this is one of those fortunate cases in which the entire incident on which the claim is based was recorded by a video surveillance camera.   A copy of that recording was included as a manual attachment to defendants' motion.[22]   Having reviewed that evidence, the Court finds that the video corroborates Gilboy's version of the events.

The law with respect to these types of claims is clear.   "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause,

---

[21]   Rec. Doc. 118-12, p. 6.   Also, it must be noted that plaintiff attached additional reports concerning the incident to his opposition to the defendants' motion.   However, those additional reports, which include Incident Reports authored by Deborah Johnson and Scott Catalnotto, Rec. Doc. 125-2, pp. 124-25, in no way create a disputed issue of fact; on the contrary, they are consistent with Gilboy's report.

[22]   Rec. Doc. 120.

the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 6 (1992) (quotation marks omitted).  The United States Fifth Circuit Court of Appeals has explained:

> Several factors are relevant in the inquiry whether unnecessary and wanton infliction of pain was used in violation of a prisoner's eighth amendment right to be free from cruel and unusual punishment. These include:
>
> 1. the extent of the injury suffered;
> 2. the need for the application of force;
> 3. the relationship between the need and the amount of force used;
> 4. the threat reasonably perceived by the responsible officials; and
> 5. any efforts made to temper the severity of a forceful response.

Hudson v. McMillian, 962 F.2d 522, 523 (5th Cir. 1992).  Here, all of these factors weigh against plaintiff.

As to the first factor, plaintiff has not established that he suffered an injury resulting from the use of force.  The undersigned is aware, of course, that a "serious" or "significant" injury is not required for an excessive force claim.  As the United States Supreme Court has explained:

> When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.  This is true whether or not significant injury is evident.  Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

Hudson, 503 U.S. at 9 (citation omitted).  Nevertheless, the United States Supreme Court has also cautioned:

> This is not to say that the absence of serious injury is irrelevant to the Eighth Amendment inquiry.  The extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation.

18

Wilkins v. Gaddy, 559 U.S. 34, 37-38 (2010) (internal citations, quotation marks, and brackets omitted).   Therefore, while an absence of injury cannot be the "sole determinate" used in analyzing an excessive force claim, it is an appropriate factor to be considered.   See, e.g., Miles v. Staude, 485 Fed. App'x 687, 688 (5th Cir. 2012).   In the instant case, this factor weighs in favor of the defendants.

The second factor also weighs in the defendants' favor.   Plaintiff was acting out aggressively and attacked Sergeant Dufresne.   In light of that fact, it was appropriate for the defendants to use a measure of force to protect Dufresne from harm and to regain control of a quickly escalating situation.

That, of course, leads to the third factor, which also weighs in the defendants' favor. Although plaintiff suggests that the force used here was disproportionate to the need, the evidence shows otherwise.   Plaintiff was not punched, kicked, or subjected to any similar uses of force. Moreover, although the use of a Taser is hardly a *de minimis* type of force, its use was not inappropriate under the circumstances of this case.   Plaintiff was violently acting out in a small enclosed space and had already attacked one officer, and the use of the Taser ceased when plaintiff was no longer posing a risk of harm to the officers or to institutional security.   While correctional officers obviously do not have free rein to use Tasers in all circumstances, this was not one of those cases in which the use of a Taser was so plainly unnecessary and disproportionate that the use was illegal.

The fourth factor also weighs against plaintiff.   Again, at the time of the incident, he was unrestrained, acting out aggressively, and had attacked a correctional officer.   Such a prisoner can

reasonably be perceived as posing a threat to the officers involved, as well as a security concern. Moreover, courts must be mindful that correctional officers rarely have the luxury of sober reflection when assessing such threats; rather, they often must act "quickly and decisively" to regain control and defuse the situation and therefore their decisions on such matters are "entitled to wide-ranging deference." Baldwin v. Stalder, 137 F.3d 836, 840 (5th Cir. 1998).

The fifth factor also weighs in the defendants' favor. Their response to threat was a tempered one. Further, as soon as the threat was neutralized and plaintiff was restrained, the incident ended with no further use of force, and plaintiff was immediately examined by medical personnel to ensure that he had not been harmed in the altercation.

In summary, this was not an incident of unbridled brutality against a compliant inmate. Rather, it was a merely brief encounter in which control was regained over a violent and resisting prisoner through a measured use of force. Any contention that the defendants were acting maliciously and sadistically to cause harm, rather than in a good-faith effort to maintain or restore discipline, is wholly unsupported by the evidence even when it is viewed in the light most favorable to plaintiff. Accordingly, the defendants are entitled to judgment as a matter of law with respect to the excessive force claim.

## IV.  Remaining Claims

### A.  Corporal Richardson

In his amended complaint, plaintiff added a claim that Corporal Richardson sentenced him to one hundred days in lockdown without a proper review.[23] That claim was not expressly addressed

---

[23]   Rec. Doc. 34, p. 11.

by the defendants in their motion. However, pursuant to its authority to act *sua sponte* under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b),[24] the Court hereby dismisses the claim as frivolous and/or for failing to state a claim on which relief may be granted.

The claim against Richardson, which is essentially a due process claim, is foreclosed by Sandin v. Conner, 515 U.S. 472 (1995). In Sandin, the United States Supreme Court held:

> [W]e recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will generally be limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own

---

[24] With respect to actions filed *in forma pauperis*, such as the instant lawsuit, federal law provides:

> Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action or appeal –
>
> > (i) is frivolous or malicious;
> > (ii) fails to state a claim on which relief may be granted; or
> > (iii) seeks monetary damages against a defendant who is immune from such relief.

28 U.S.C. § 1915(e)(2)(B).

Moreover, federal law further mandates that federal courts "review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). Regarding such lawsuits, federal law requires:

> On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint –
>
> > (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or
> > (2) seeks monetary relief from a defendant who is immune from such relief.

28 U.S.C. § 1915A(b).

force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

Sandin, 515 U.S. at 483-84 (citations omitted).  The United States Fifth Circuit Court of Appeals then held: "In the wake of Sandin, ... 'administrative segregation, without more, simply does not constitute a deprivation of a constitutionally cognizable liberty interest.'"  Pichardo v. Kinker, 73 F.3d 612, 613 (5th Cir. 1996) (quoting Luken v. Scott, 71 F.3d 192, 193 (5th Cir. 1995)).  The Fifth Circuit has further noted that after Sandin "it is difficult to see that any other deprivations in the prison context, short of those that clearly impinge on the *duration* of confinement, will henceforth qualify for constitutional 'liberty' status" entitled to procedural due process protections.  Orellana v. Kyle, 65 F.3d 29, 31-32 (5th Cir. 1995) (emphasis added).  Stated differently, the Fifth Circuit has observed that the liberty interests protected by the Due Process Clause are "generally limited to state created regulations or statutes which affect the *quantity of time* rather than the *quality of time* served by a prisoner."  Madison v. Parker, 104 F.3d 765, 767 (5th Cir. 1997) (emphasis added).[25]

---

[25]   The Court acknowledges that this general rule does not apply when the conditions are unusually onerous or the disciplinary confinement is for a prolonged duration.  For example, the United States Supreme Court has held that solitary confinement in a "Supermax" facility imposed an atypical and significant hardship that created a liberty interest in avoiding such a placement when all of the following factors were taken together:  almost all human contact, including cell to cell conversation, was prohibited; the light was on for 24 hours per day; exercise was for one hour per day, but only in a small indoor room; the placement was indefinite and reviewed only annually; *and* the placement disqualified an otherwise eligible inmate from parole consideration.  Wilkinson v. Austin, 545 U.S. 209, 223-24 (2005).  However, the conditions of plaintiff's confinement on lockdown do not even begin to rise to the level of conditions described in Wilkinson.  Moreover, his disciplinary sentence was only one hundred days, far below a duration sufficient to give rise to a liberty interest.  See, e.g., Jones v. Baker, 155 F.3d 810, 812-13 (6th Cir. 1998) (holding that administrative segregation for two and one-half years did not give rise to a liberty interest); Griffin v. Vaughn, 112 F.3d 703, 708 (3rd Cir. 1997) (finding that inmate's placement in administrative segregation for fifteen months did not give rise to a liberty interest); Hernandez v. Velasquez, 522 F.3d 556, 563 (5th Cir. 2008) (finding that protective lockdown for twelve months did not give rise to a liberty interest).

Because plaintiff's disciplinary conviction affected only the "quality," not the "quantity," of the time he must serve, <u>Sandin</u> bars his claim against Richardson for the denial of due process.

### B.  Claims Against Warden Roland Ladreyt

Plaintiff has also sued Warden Roland Ladreyt, noting that "[h]e is legally responsible for the operation of N.C.C.C. and for the welfare of all the inmates in the correctional center."[26]  Of course, it is beyond cavil that a supervisory official may not be held liable pursuant to § 1983 under any theory of vicarious liability.  <u>See, e.g.</u>, <u>Thompkins v. Belt</u>, 828 F.2d 298, 303 (5th Cir. 1987); <u>see also</u> <u>Oliver v. Scott</u>, 276 F.3d 736, 742 (5th Cir. 2002) ("Section 1983 does not create supervisory or <i>respondeat superior</i> liability.").  Nevertheless, such an official may be held liable in his individual capacity for his own actions in failing to properly supervise or train his subordinates; however, that does not apply where, as here, there was no underlying constitutional violation.  <u>See, e.g.</u>, <u>Whitley v. Hanna</u>, 726 F.3d 631, 648 (5th Cir. 2013) ("All of Whitley's inadequate supervision, failure to train, and policy, practice, or custom claims fail without an underlying constitutional violation."), <u>cert. denied</u>, 134 S. Ct. 1935 (2014); <u>Billizone v. Jefferson Parish Correctional Center</u>, Civ. Action No. 14-1263, 2014 WL 7139636, at *5 (E.D. La. Dec. 15, 2014); <u>Wallack v. Jackson County, Mississippi</u>, Civil Action No. 1:13cv103, 2014 WL 2154202, at *8 (S.D. Miss. May 22, 2014); <u>Kennedy v. City of Shreveport</u>, Civ. Action No. 07-1049, 2008 WL 2437043, at *6 (W.D. La. June 13, 2008).

---

[26]   Rec. Doc. 34, p. 3.

## C.  Official-Capacity Claims

Plaintiff also indicates that he is also suing all of the defendants in their official capacities.[27] However, because there was no underlying constitutional violation in this case, the official-capacity claims necessarily fail.  See, e.g., Royal v. Spragins, 575 Fed. App'x 300, 305 (5th Cir. 2014); Billizone, 2014 WL 7139636, at *5.

## D.  State Law Claims

Lastly, to the extent that plaintiff is also asserting claims under state law, the Court declines to consider those claims in light of the fact that plaintiff's federal claims are being dismissed.  See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction ...."); see also Jackson v. Mizzel, 361 Fed. App'x 622, 627 (5th Cir. 2010) ("Because [the plaintiff] states not one valid federal claim, the district court properly declined jurisdiction over his Louisiana causes of action."); Bass v. Parkwood Hospital, 180 F.3d 234, 246 (5th Cir. 1999) ("When a court dismisses all federal claims before trial, the general rule is to dismiss any pendent claims."). If plaintiff wishes to pursue claims under state law, he must do so in the state courts.

Accordingly, for all of the foregoing reasons,

**IT IS ORDERED** that the defendants' motion for summary judgment, Rec. Doc. 118, is **GRANTED**.

---

[27]   Rec. Doc. 34, p. 3.

24

**IT IS FURTHER ORDERED** that plaintiff's federal civil rights claims against all defendants are **DISMISSED WITH PREJUDICE** and that his state law claims are **DISMISSED WITHOUT PREJUDICE** to their being asserted in the state courts.

New Orleans, Louisiana, this fifteenth day of January, 2015.


**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**